*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

_____

Before
KING, STEPHENS, and ATTANASIO
Appellate Military Judges

_____

**UNITED STATES**
Appellee

**v.**

**Gregory S. SIMPSON**
Gunnery Sergeant (E-7), U.S. Marine Corps
Appellant

**No. 201800268**

Argued: 6 February 2020—Decided: 11 March 2020

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
Robert D. Merrill

Sentence adjudged 2 May 2018 by a general court-martial convened at Marine Corps Base Quantico, Virginia, consisting of a military judge alone. Sentence approved by the convening authority: reduction to pay grade E-1, confinement for thirty-two months, and a bad-conduct discharge.[1]

_____

[1] Pursuant to a pretrial agreement, the convening authority suspended confinement in excess of eighteen months. Appellant was credited with 243 days of pretrial confinement.

For Appellant:
*Ms. Tami L. Mitchell, Esq.* (argued)
*Mr. David P. Sheldon, Esq.* (on brief)
*Lieutenant Clifton Morgan, JAGC, USN* (on brief).

For Appellee:
*Major Clayton L. Wiggins, USMC* (argued)
*Lieutenant Clayton S. McCarl, JAGC, USN* (on brief)
*Captain Brian Farrell, USMC* (on brief).

Senior Judge KING delivered the opinion of the Court, in which Judge STEPHENS and Judge ATTANASIO joined.

_____

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

_____

KING, Senior Judge:

Consistent with his pleas, Appellant was convicted of one specification of conspiring to create and distribute an indecent visual recording, one specification of aiding and abetting the creation of an indecent visual recording, one specification of aiding and abetting the distribution of an indecent visual recording, and three specifications of assault consummated by a battery, in violation of Articles 81, 120c, and 128, Uniform Code of Military Justice [UCMJ], 10 U.S.C. §§ 881, 920c, 928 (2012). Appellant now raises numerous assignments, summary assignments, and supplemental assignments of error [AOEs], several of which we discuss and resolve below. The remaining AOEs have been fully considered but merit neither discussion nor relief. *See United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987). After careful review of each, we modify in part but ultimately affirm his convictions and sentence.[2]

_____

[2] On 6 February 2020, the Court heard oral argument on the following issues:

I. To convict under Article 120c(a)(3), must the Government prove the attendant circumstances of both an indecent viewing under Article 120c(a)(1), and an indecent recording under Article 120c(a)(2)?

## I. BACKGROUND

The details relevant to our analysis are adequately set forth in Prosecution Exhibit [Pros. Ex.] 1, the agreed upon stipulation of fact: In 2016, Appellant was assigned as a liaison officer to the McAlester Army Ammunition Plant in Oklahoma where he began an intimate relationship with CB. At the same time, Appellant was engaged in an intimate relationship with MB. In order to conceal from CB his communications with MB, Appellant utilized an email account.

CB suspected the infidelity and gained access to the email account. CB's suspicions were confirmed when she observed exchanges of sexually explicit emails and nude photographs of a female CB believed to be MB. CB confided in her friend JR and provided the password to Appellant's email account to JR, who accessed the account and saved the emails. JR noticed the nude photographs were actually of MB's eighteen-year-old daughter, EF, and discovered that Appellant and MB discussed performing sex acts upon EF and administering medications to EF to enable them to do so. Erroneously believing EF was under the age of 18, JR reported the matter to authorities.

NCIS agents contacted Appellant, who consented to the search and seizure of his mobile phone where the emails and pictures of EF were discovered. The photographs were of EF completely nude in the bathtub or in the bedroom of her home or clothed but with the focus on her private areas. The search also revealed an email exchange between MB and Appellant where the two discussed a "threesome" with EF, numerous email requests from Appellant to MB for pictures of EF, and numerous instances where MB sent those photographs to Appellant. The record indicates MB misled EF to gain access to EF while EF was nude in the bathroom and that EF did not know MB was recording her private areas during those times.

Shortly after the investigation commenced, Appellant was transferred to Marine Corps Base Quantico, where he met TS and began living with her and her two minor children in her residence. Appellant did not disclose the true nature of the Oklahoma investigation and the couple married in June 2017.

---

II. Whether one who causes another to deliver an indecent visual recording to oneself may providently plead guilty to distribution of that same indecent visual recording under Articles 77 and 120c(a)(3), in light of *United States v. Hill*, 25 M.J. 411 (C.M.A. 1988)?

III. In light of the Government's charging theory, were Appellant's guilty pleas to Charge I, Specifications 2 and 3 provident when his alleged co-conspirator was not subject to the UCMJ?

When TS learned of the Oklahoma allegations, she demanded Appellant leave the home. Appellant complied, but returned days later and began arguing with TS. That argument turned physical and TS called 911. During the course of this altercation, Appellant was alleged to have threatened to kill TS as well as threatened to "burn down [her] house with [her] kids in it."

Based upon the above conduct, Appellant entered into a pretrial agreement and pleaded guilty to the following:

Charge I: Violating Article 81, UCMJ by:

Specification 2: "[Appellant] conspired with [MB] to commit an offense under the UCMJ, to wit Article 120c(a)(2) *Indecent Visual Recording* and in order to effect the object of the conspiracy: 1) MB took nude photographs of her daughter, Ms. [EF]. 2) [MB] sent the photographs to [Appellant]. 3) [Appellant] accepted receipt of those photographs by email."

Specification 3: "[Appellant] conspired with [MB] to commit an offense under the UCMJ, to wit Article 120c(a)(3) *Distribution of an Indecent Visual Recording* and in order to effect the object of the conspiracy: 1) MB took nude photographs of her daughter, Ms. [EF]. 2) [MB] sent the photographs to [Appellant]. 3) [Appellant] accepted receipt of those photographs by email."

Charge II: Violating Article 120c, UCMJ by:

Specification 1: Indecent Visual Recording (120c(a)(2)): "[Appellant] knowingly photographed the private area of [EF] without her consent and under circumstances in which she had a reasonable expectation of privacy."

Specification 2: Distribution of an Indecent Visual Recording (120c(a)(3)): "[Appellant] knowingly distributed a recording of the private area of [EF] when he knew or reasonably should have known that the recording was made and distributed without the consent of [EF] and under the circumstances in which she had a reasonable expectation of privacy."

Charge III: Violating Article 128, UCMJ when he committed the following acts on the same day:

Specification 1: "[U]nlawfully grabbed [TS] by the arms with his hands and threw her around a room."

Specification 2: "[U]nlawfully grabbed [TS] by the neck with his hands and pinned her against a wall."

Specification 3: "[U]nlawfully grabbed [TS's] neck with his hands and pinned her against a wall."[3]

After pleading guilty, Appellant explained under oath that he entered into an agreement with MB wherein MB agreed to take nude photographs of EF's private areas and send them to him electronically for his sexual gratification. He admitted that the photos were taken without EF's consent and in an area in which EF had a reasonable expectation of privacy. Appellant also admitted that he was guilty as a principal under Article 77(1), UCMJ, 10 U.S.C. § 877(1), by aiding and abetting the wrongful recording and distribution to another of images of EF's private areas. Finally, he admitted that the acts alleged in Specifications 1 and 2 of Charge III took place during the same day and over the course of 15 minutes to an hour. Before announcing findings, the military judge consolidated Specifications 2 and 3 of Charge I for findings[4] as well as the three specifications of Charge III for sentencing.[5]

## II. DISCUSSION

### A. Whether There Is a Substantial Basis in Law or Fact to Question the Providence of Appellant's Guilty Pleas

We review a military judge's decision to accept a guilty plea for an abuse of discretion and questions of law de novo. *United States v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F. 2008).

> A military judge abuses this discretion if he fails to obtain from the accused an adequate factual basis to support the plea—an area in which we afford significant deference. . . .

---

[3] App. Ex. XXI at 8-10; App. Ex. XXIII.

[4] Appellant pleaded not guilty to Specification 1 of Charge I. Consolidated Specification 2 of Charge I read as follows: "Violation of UCMJ, Article 81, on or about 6 December 2016, at or near McAlester, OK, active duty U.S. Marine GySgt Gregory Simpson conspired with [MB] to commit offenses under the UCMJ, to wit Article 120c(a)(2) Indecent Visual Recording and Article 120c(a)(3) Distribution of and Indecent Visual Recording, and in order to effect the object of the conspiracy: 1) [MB] took nude photographs of her daughter, [EF]. 2) [MB] sent the photographs to GySgt Simpson. 3) GySgt Simpson accepted receipt of those photographs by email." Record at 221-22; App. Ex. XXIII.

[5] Record at 225.

> There exist strong arguments in favor of giving broad dis-
> cretion to military judges in accepting pleas, not least because
> facts are by definition undeveloped . . . [when] an accused
> might make a conscious choice to plead guilty in order to "limit
> the nature of the information that would otherwise be disclosed
> in an adversarial contest."

*Id.* (citations omitted). "[A]ppellant bears the burden of establishing that the military judge abused that discretion." *United States v. Price*, 76 M.J. 136, 138 (C.A.A.F. 2017) (citation and internal quotations marks omitted). In order to reject a guilty plea on appellate review, the record must show a substantial basis in law or fact for questioning the plea. *Inabinette*, 66 M.J. at 322.

Appellant now raises several bases for questioning the providence of his pleas.

*1. Appellant asserts he may not be convicted under Article 81, UCMJ, since his co-conspirator was not subject to the UCMJ*

Appellant claims that conspiracy requires that the parties agree upon a criminal goal and, since MB was not subject to the UCMJ and the conduct prohibited by Article 120c was not otherwise prohibited under state or federal law, it was "legally impossible for [MB] to agree with [Appellant]" to commit that offense.[6] The Government counters that "legal impossibility is not a defense" to conspiracy.[7]

Conspiracy punishes the act of two or more parties entering into an agreement to commit a crime. *United States v. Simpson*, 77 M.J. 279, 284 (C.A.A.F. 2018) (citation omitted). The power to define that crime, including the requisite nature of the agreement and the parties thereto, is vested in the legislature. *See Whalen v. United States*, 445 U.S. 684, 689 (1980) (citations omitted) (explaining the "basic principle that within our federal constitution-al framework the legislative power, including the power to define criminal offenses resides wholly with the Congress"). Congress has defined the crime of conspiracy under the UCMJ as follows: "Any person subject to this chapter who conspires with any other person to commit an offense under this chapter shall, if one or more of the conspirators does an act to effect the object of the conspiracy, be punished as a court martial shall direct." Article 81, UCMJ.

---

[6] Appellant's Brief at 10. We will assume without deciding that Appellant's contention regarding state or federal law is correct.

[7] Appellee's Brief at 17.

Congress specifically chose the clear and unambiguous language "any other person" to describe co-conspirators and "to commit an offense under this chapter" to describe the applicable crimes. Appellant's narrowing interpretation ignores this plain language and would preclude punishing an accused for conspiring with anyone not subject to the UCMJ to commit a host of purely military offenses, e.g. Article 84 (Effecting Unlawful Enlistments), Article 94 (Mutiny and Sedition), Article 100 (Subordinate Compelling Surrender), and Article 104 (Aiding the Enemy) to name but a few. This absurd result is also directly contrary to the guidance found in the *Manual for Courts-Martial*, which states: "[t]he accused must be subject to the code but the other co-conspirators need not be." *Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), Part IV, ¶ 5(c). This assignment of error is without merit.

Nor do we agree with Appellant that our holding adopts the "unilateral" conspiracy framework ostensibly rejected by our superior court. The case most-relied upon by Appellant for this proposition is *United States v. Valigura*, wherein Private Valigura agreed to sell drugs to an undercover law enforcement officer and was charged with conspiring with that individual. 54 M.J. 187 (C.A.A.F. 2000). The Court of Appeals for the Armed Forces [CAAF] recognized that Appellant's co-conspirator had no criminal intent, operating instead for law enforcement purposes and reasoned that "[i]f there is no actual agreement or 'meeting of the minds' there is no conspiracy." *Id.* at 188. Appellant argues his case is similar, that since MB's actions were not illegal for her to commit, there was no meeting of the minds regarding a "criminal goal," leaving but one party to the agreement. But Appellant ignores the distinction that *Valigura* involved an undercover agent who had no intention of committing an offense. In such cases, it is "well settled that there can be no conspiracy when a supposed participant merely feigns acquiescence with another's criminal proposal in order to secure his detection and apprehension by proper authorities." *Id.* at 189. Unlike the "feigning agent" in *Valigura*, MB did agree to commit an offense under the UCMJ and took necessary steps to commit that offense. Therefore, the "meeting of the minds" lacking in *Valigura* was clear and present in Appellant's case. It matters not that MB was not herself exposed to punishment for the object of that conspiracy.

*2. Appellant asserts he may not be convicted of conspiring to distribute indecent images and of distributing those same images*

Appellant pleaded guilty to conspiring with MB to distribute indecent recordings of EF. As a principal under Article 77(1), UCMJ, he also pleaded guilty to the underlying crime of distributing those images. He now argues he

may not be found guilty of both when "the agreement exists only between the people necessary to commit [the offense of distribution.]"[8]

Since "conspiracy poses distinct dangers quite apart from those of the substantive offense," *Iannelli v. United States*, 420 U.S. 770, 778 (1975), conspiracy may generally be charged and punished separately from any crime which may be the object of that conspiracy. *United States v. Johnson*, 58 M.J. 509, 511 (N-M Ct. Crim. App. 2003) (citation omitted). "Wharton's Rule" is an exception to this general rule and prohibits punishing conspiracy separately if the agreement of two people is necessary to complete the substantive crime. This rule is captured in the *MCM*, which states: "Some offenses require two or more culpable actors acting in concert. There can be no conspiracy where the agreement exists only between the persons necessary to commit such an offense." *MCM,* Part IV, ¶ 5c(3). Appellant argues that Wharton's Rule prohibits his conviction of both conspiring to distribute indecent images and distributing those images because distribution "requires two people for the [distribution] to occur."[9] Perhaps, but Appellant's argument stops short.

In *United States v. Simmons*, the appellant was found guilty of, *inter alia*, nine specifications of conspiracy to alter a public document and two specifications of conspiring with a co-conspirator to commit graft. 34 M.J. 243 (C.M.A. 1992). On review, the Army Court of Military Review consolidated all the conspiracy charges into one specification, holding "there was but one conspiracy with numerous overt acts." The Court of Military Appeals [C.M.A.] was thereafter presented with the question of whether Simmons could conspire with a co-conspirator who was the participant in the graft. While determining that "graft requires two persons and therefore 'Wharton's Rule' would apply[,]" the C.M.A. nonetheless held that, since the consolidated conspiracy specification also alleged the separate crime of altering public documents, a crime that did not require two individuals for its commission, Wharton's Rule was inapplicable to the specification as consolidated. *Simmons*, 34 M.J. at 243-44.

The *Simmons* court's logic built upon the earlier case of *Crocker*, where the C.M.A. held that Wharton's Rule was inapplicable to a conspiracy specification that alleged an agreement to both possess and transfer cocaine. 18 M.J. 33 (C.M.A. 1984). That court reasoned:

---

[8] Appellant's Brief at 10-11 (brackets in original).

[9] Appellant's Brief at 11.

> When two persons agree to accomplish several criminal objectives, the plurality of objectives does not result in there being more than one conspiracy. Indeed, it would be improper to charge several conspiracies where there was only a single agreement. Since appellant and [co-conspirator] had a single agreement—which contemplated both possession and transfer of the cocaine—the draftsmen of the charges properly alleged conspiracy in a single specification. If no reference to transfer had been contained in that specification and only a conspiracy to possess had been alleged, Wharton's Rule clearly would not apply because possession does not require concerted criminal action. We do not see how the reference in this specification to another purpose of the conspiracy—namely, transfer of the cocaine—could change this result. Instead, for purposes of Wharton's Rule, the allegation that a second purpose of the conspiracy was to transfer cocaine should be treated as redundant.

*Crocker*, 18 M.J. at 39-40.

Here, noting the Wharton's Rule issue on the record, the military judge correctly consolidated the specification of conspiracy to take indecent photographs of EF and the specification of conspiracy to distribute those photographs into one specification alleging one conspiracy. He then stated, "I believe this consolidation also eliminates any possible concern for Wharton's Rule insofar as the consolidated specification alleges a conspiracy to photograph, which only requires one individual."[10] We concur that this consolidation alleviated any issue under Wharton's Rule and find no basis to question Appellant's plea in this regard.

*3. Appellant asserts he may not be convicted of distributing indecent images when the images were sent only to him*

Specification 2 of Charge II alleged Appellant, as an "aider and abettor" under Article 77(1), UCMJ, wrongfully distributed indecent recordings of EF on divers occasions, in violation of Article 120c(a)(3), UCMJ. Article 120c(a), UCMJ provides that:

> Any person subject to this chapter who, without legal justification or lawful authorization—
>
>   (1) knowingly and wrongfully views the private area of another person, without that other person's consent and under

---

[10] Record at 222.

circumstances in which that other person has a reasonable expectation of privacy;

(2) knowingly photographs, videotapes, films, or records by any means the private area of another person, without that other person's consent and under circumstances in which that other person has a reasonable expectation of privacy; or

(3) knowingly broadcasts or distributes any such recording that the person knew or reasonably should have known was made under the circumstances proscribed in paragraphs (1) and (2); is guilty of an offense under this section and shall be punished as a court-martial may direct.

Article 120c(d)(5), UCMJ defines "distribute" as: "delivering to the actual or constructive possession of another, including transmission by electronic means."

Appellant claims here that since distribution requires delivering to the possession of another, it is legally impossible for him to "distribute" the indecent recordings to himself. He also asserts that he "can only be found guilty of distribution if he would be guilty of performing the act directly."[11] In other words, he may not be criminally liable "if [MB's] acts in taking and sending the nude pictures of her adult daughter are not criminal [for MB to commit]."[12] The Government responds that because Appellant "caused the distribution to happen under Article 77(2)" he is liable for MB's distribution as a principal.[13]

Article 77, UCMJ, states:

Any person punishable under this chapter who—

(1) commits an offense punishable by this chapter, or aids, abets, counsels, commands, or procures its commission; or

---

[11] Appellant's Reply Brief at 7.

[12] Appellant's Reply Brief at 8.

[13] Appellee's Brief at 21. During the providence inquiry, the military judge explained the elements and definitions of aider and abettor liability under Article 77(1), UCMJ, and Appellant admitted to liability for this offense under this provision. We therefore decline the Government's invitation to summarily resolve this assignment of error under Article 77(2), UCMJ. Nor must we. Subparagraph (1) has the same impact, namely, creating liability when a Service Member "counsels" another to commit "an offense punishable by this chapter."

> (2) causes an act to be done which if directly performed by
> him would be punishable by this chapter; is a principal.

Appellant's claim that he may not "deliver" to himself ignores the Government's charging theory, which subjected Appellant to criminal liability as a principal for aiding and abetting the act of MB distributing the recordings "to another." The military judge fully explained this charging theory to Appellant in the presence of his counsel during the plea inquiry, including the elements and definitions of Article 77(1).[14] After doing so, Appellant responded in the affirmative when the military judge asked "[d]id you encourage, advise, instigate, and counsel [MB] to commit the offense of distribution of an indecent recording?"[15] Moreover, in conjunction with the plea inquiry, Appellant entered into a stipulation of fact wherein he admitted that he "knowingly and willfully counseled [MB] to photograph . . . the private areas of [EF], and to send them to him via email."[16] He also admitted that he was "guilty of distribution of indecent visual recordings of [EF] even though he was not physically present with [MB] when she took the photographs . . . or when she sent the photographs[.]" Finally, Appellant conceded that MB would not otherwise have taken the photos "if [Appellant] did not counsel [her] to take the photographs [and] that [she] would not otherwise have sent them if [he] did not counsel [MB] to [do so]."[17] The record clearly indicates that Appellant understood the elements of the offense as well as his culpability under Article 77(1), admitted fully to guilt under that theory, and a factual basis exists to support that plea.

We also reject Appellant's argument that he could not be criminally liable under Article 77, UCMJ, because MB's "actions were not criminal" for MB to

---

[14] The military judge explained: "Any person who actually commits an offense is a principal. Anyone who knowingly and willfully aides or abets another in committing an offense is also a principal and equally guilty of the offense. An aider or abettor must knowingly and willfully participate in the commission of the crime as something he wishes to bring about and must aide, encourage, or incite the person to commit the criminal act. Presence at the scene of the crime is not enough, nor is failure to prevent the commission of an offense. There must be an intent to aide or encourage the person who commits the crime. Although the accused must consciously share in the actual perpetrators criminal intent to be an aider or abettor, there is no requirement that the accused agree with or even have the knowledge of the means by which the perpetuator is to carry out that criminal intent." Record at 205.

[15] Record at 210.

[16] Pros. Ex. 1 at 6.

[17] *Id.*

commit. As with Article 81 conspiracy, discussed above, the wording of Article 77, UCMJ, is clear and unambiguous: Appellant is exposed to criminal liability whenever he, sharing in the criminal design, "aids, abets, counsels, commands or procures" an "offense punishable by this chapter." For criminal liability founded upon Article 77, there is no requirement that the actual perpetrator of the criminal act be subject to the UCMJ. In fact, such perpetrator need not even be identified. *MCM*, Part IV, ¶ 1.b.(6); s*ee also MCM*, Part IV, ¶ 2.c.(4) (regarding the similar relationship between principals and accessories after the fact: "The principal who committed the offense . . . need not be subject to the code"). Appellant's reading of the statute would re-write Article 77 to read "any person subject to this chapter who aids and abets another person subject to this chapter" and limit application of Article 77 far beyond what Congress intended.

*4. Appellant asserts wrongful distribution of an indecent recording under Article 120c requires both an indecent viewing and an indecent recording*

Appellant next posits that the conjunctive "and" in Article 120c(a)(3), UCMJ, criminalizes only the distribution of recordings that are both an indecent viewing and an indecent recording. This is significant, he argues, since there is "no evidence that MB 'indecently' viewed [EF]."[18] To the contrary, Appellant claims the evidence shows that [EF] was aware [MB] was viewing her and consented to the viewing, thus depriving EF of a "reasonable expectation of privacy." Without this expectation of privacy, Appellant argues the viewing could not be indecent, thus it was legally impossible for Appellant to be guilty of distributing indecent recordings. An issue of statutory construction is a question of law we review de novo. *United States v. Wilson*, 76 M.J. 4, 6 (C.A.A.F. 2017).

Paragraphs (1) and (2) of Article 120c(a) prohibit viewing or recording images of the private areas of another without that person's consent and under circumstances in which that person had a reasonable expectation of privacy. Paragraph (3) prohibits broadcasting or distributing those recordings when the accused knew or reasonably should have known those recordings were made *under the circumstances proscribed* in paragraphs (1) and (2). Those circumstances are "without consent" and "under circumstances in which that other person has a reasonable expectation of privacy."

---

[18] Appellant's Brief at 11.

Appellant's counsel recently raised the same issue with our sister court. In analyzing the conjunctive "and" in Article 120c(a)(3), the Air Force Court of Criminal Appeals determined that:

> [T]he "circumstances proscribed" language in paragraph (3) means recordings made "without that other person's consent and under circumstances in which that other person has a reasonable expectation of privacy," which is language common to paragraphs (1) and (2) . . . and thus explains the conjunction. Our reasoning is illuminated by the language in paragraph (3) that uses the verb "made," and not "viewed" or "made and viewed," to link the act of distribution with the "under the circumstances prescribed in" language at issue. Even if our plain reading leaves doubt, we find that Article 120c(a)(3), UCMJ, is nevertheless unambiguous. Congress and the President could not have intended we read Article 120c(a), UCMJ, in the unduly restrictive manner Appellant proposes we should. The statute forbids three separate acts—viewing, recording, and broadcasting or distribution of another's private area—that are violations of law when done knowingly and under identically proscribed circumstances. The acts are separated by the disjunctive, "or," in the text of both the header and the substantive paragraphs of the statute.

*United States v. Bessmertnyy*, No. ACM 39322, 2019 CCA LEXIS 255, at *24 (A.F. Ct. Crim. App. Jun. 14, 2019) (unpub. op.).

We concur with this analysis. Appellant's interpretation of the statute would not only lead to absurd results,[19] it is also contrary to the elements of this offense, which were clearly set forth by the military judge during the plea inquiry.[20] Rejecting Appellant's interpretation that Article 120c(a)(3),

---

[19] As the *Bessmertnyy* court noted: "an appellant who surreptitiously made a video recording of a victim's private area under proscribed circumstances might be found guilty of making an indecent recording, but criminal liability for indecent broadcasting or distribution of that same recording would depend on whether or not the appellant also viewed the private area of the victim at the same time the appellant made the recording." 2019 CCA LEXIS 255, at *24.

[20] "One, that on divers occasions between on or about 1 December 2016 and on or about 19 February 2017, at or near McAlester, Oklahoma, you and or [MB] knowingly distributed a recording of the private area of [EF]; two, the recording was made without the consent of [EF]; three, that you and [MB] knew or reasonably should have known that the recording was made without the consent of [EF]; four, that the recording was made under circumstances in which [EF] had a reasonable

UCMJ, requires an indecent viewing *and* an indecent recording, we need not address his contention that EF lacked a reasonable expectation of privacy when she was viewed by her mother. It is enough that Appellant repeatedly admitted that EF did not know her mother was recording her private areas, contributing to the overwhelming support in the record that EF maintained her reasonable expectation of privacy from *being recorded,* a position appellate defense counsel conceded at oral argument.

*5. Appellant asserts he misunderstood the portion of the pretrial agreement suspending confinement*

In his pretrial agreement, Appellant agreed that any awarded confinement:

> May be approved as adjudged. However, all confinement in excess of eighteen months will be suspended for the period of confinement adjudged plus 12 months thereafter, at which time, unless sooner vacated, the suspended portion will be remitted without further action. This Agreement constitutes my request for, and the Convening Authority's approval of, deferment of all confinement suspended pursuant to the terms of this Agreement. The period of deferment will run from the date of adjournment of the court-martial until the date the Convening Authority acts on the sentence.[21]

In his action, the Convening Authority stated: "Pursuant to the pretrial agreement, all confinement in excess of eighteen months is suspended. The suspension period shall begin from the date of this action and continue for [forty-four] months. At that time, unless vacated, the suspended part of the confinement sentence will be automatically remitted."[22] Appellant now claims that his understanding was that that suspended confinement would be suspended from the date of sentencing, not the date of action and that the parties failure to reach a "meeting of the minds" regarding the length of suspension, renders the agreement unenforceable.[23]

---

expectation of privacy; five, that you knew or reasonably should have known that the recording was made under circumstances in which [EF] had a reasonable expectation of privacy; and, six; that your conduct was wrongful." Record at 188-189.

[21] App. Ex. XXII at 1.

[22] Convening Authority's Action of Aug. 27, 2018.

[23] Appellant's Reply at 14.

"A pretrial agreement is a contract between the accused and the convening authority. Therefore, we look to the basic principles of contract law when interpreting pretrial agreements." *United States v. Lundy*, 63 M.J. 299, 301 (C.A.A.F. 2006) (citation and internal quotation marks omitted). Whether the Government has complied with the material terms and conditions of an agreement presents a mixed question of law and fact. *Id.* If the Government breaches a material term in an agreement, we may do one of four things: (1) permit Appellant to withdraw from the agreement; (2) require specific performance; (3) provide alternative relief with Appellant's consent; or (4) provide an adequate remedy to cure the material breach of the agreement. *Id.* at 305 (Effron, J., concurring).

The record supports the conclusion that the probationary period of confinement would begin on the date of action: the pretrial agreement stated that the deferral of all suspended confinement would end "on the date of action" and, while Rule for Courts-Martial [R.C.M.] 1108 authorizes convening authorities to suspend confinement in some circumstances, any such suspension may only occur upon convening authority's action and not before. *See also*, Art.60(c)(2)(B), UCMJ. On the other hand, the pretrial agreement—the contract between the parties—is technically silent on when the suspension period will begin. Therefore, to assist in determining the parties' understanding of the contract, we turn to the judge's explanation of its terms.

The military judge is required to ensure that the accused understands the pretrial agreement and the parties agree to its terms. R.C.M. 910(f)(4); *see also United States v. King*, 3 M.J. 458 (C.M.A. 1977); *United States v. Green*, 1 M.J. 453, 456 (C.M.A. 1976). "We have long emphasized the critical role that a military judge and counsel must play to ensure that the record reflects a clear, shared understanding of the terms of any pretrial agreement between an accused and the convening authority." *United States v. Williams*, 60 M.J. 360, 362 (C.A.A.F. 2004) (citation omitted).

After the sentence was announced, the military judge stated:

> So I have [the pretrial agreement], which indicates . . . [t]he confinement, which I've adjudged [thirty-two] months, that may be approved as adjudged; however, everything [in] excess of [eighteen] months will be suspended for the period of confinement plus [twelve] months thereafter . . . Do counsel agree with the Court's interpretation of [the pretrial agreement]?[24]

---

[24] Record at 325.

Both sides did.

Here, the use of the words "period of confinement" did little to clarify the parties understanding as to when the forty-four month probation period would begin. In fact, this term could have added confusion, since, due to factors such as pretrial confinement credit, "period of confinement" may not ultimately equate to the "eighteen months" period used in the convening authority's action. *See also* Dep't of Defense Manual 1325.07-M, DoD Sentence Computation Manual (Jul. 27, 2004) (setting forth measures by which approved periods of confinement may be modified post convening authority action).

Therefore, absent clarity, and to eliminate prejudice to Appellant caused by any misunderstanding, we will order what Appellant now reasonably claims he believed to be specific performance: suspension of confinement for a period of time equal to forty-four months from the date Appellant's sentence was announced.[25]

## B. Whether the Military Judge Erred in Denying Defense Motion to Merge Assault Specifications on Findings

At trial, the Defense moved to merge for findings the three assault specifications under Charge III because the specifications represented an unreasonable multiplication of charges.[26] The military judge denied the Defense motion, agreeing with the Government that the specifications were neither multiplicious nor unreasonably multiplied because: "[t]he three specifications are aimed at three separate and distinct acts."[27] Appellant then

---

[25] Suspension provisions within pretrial agreements should be drafted with precision, mindful of the mandates of R.C.M. 1108, which states suspension of the execution of a sentence "shall be for a stated period or until the occurrence of an anticipated future event. . . . [and] shall not be unreasonably long." R.C.M. 1108(d). In addition, R.C.M. 1108(e) states, in part: "[S]eparation which terminates status as a person subject to the code *shall result in remission* of the suspended portion of the sentence." (Emphasis added). Suspension provisions should therefore also take into account the jurisdictional limitations of Article 2, UCMJ, the uncertainty of ultimate confinement release dates (e.g., Dep't of Defense Manual 1325.07-M), and the needs of good order and discipline. While utilizing "shell" language is a start at drafting these provisions, the drafting should not end there. *See also United States v. Angel*, No. 1467, 2019 CCA LEXIS 499, at *4 (C.G. Ct. Crim. App. Dec. 13, 2019) (unpub. op.) ("we suggest more explicit language in pretrial agreements that include a suspension term, concerning the starting point of the probationary period.")

[26] App. Ex. V.

[27] App. Ex. XVI at 3.

entered into a pretrial agreement wherein he agreed to plead guilty unconditionally to Specifications 1 and 2, and plead guilty to the lesser included offense under Specification 3 of assault consummated by a battery. During the plea inquiry, Appellant admitted that the acts alleged in the first two specifications were the result of a fight that lasted "approximately ten minutes."[28] Appellant explained that there was then a five minute "cool down period" during which the parties were "trying to be more rational."[29] Following that five minutes, Appellant admitted the act of Specification 3 took place. After the plea inquiry, the judge reiterated his pretrial ruling, stating "I believe these are three distinct acts as opposed to multiple acts and one transaction. There was a five minute separation between each of the three acts."[30] Appellant now claims the military judge erred when he failed to merge the three specifications into one for findings. The Government responds that Appellant waived the issue with his unconditional guilty plea.

An accused who pleads guilty unconditionally to several specifications relinquishes his entitlement to challenge them for multiplicity unless he can show they are "facially duplicative" of one another. See *United States v. Broce*, 488 U.S. 563, 575 (1989); *United States v. Campbell*, 68 M.J. 217, 219 (C.A.A.F. 2009). This inquiry is a question of law which we review de novo. *United States v. Pauling*, 60 M.J. 91, 94 (C.A.A.F. 2004). "Offenses are 'facially duplicative' if, on the face of the guilty plea record, it is apparent that the multiple convictions offend the Double Jeopardy Clause because admission to one offense cannot 'conceivably be construed' as amounting to more than a redundant admission to another." *United States v. Hernandez*, 78 M.J. 643, 645 (C.G. Ct. Crim. App. 2018) (quoting *Broce*, 488 U.S. at 576). This type of multiplicity is grounded in the Double Jeopardy Clause of the Fifth Amendment, which prohibits multiple punishments for the same offense. U.S. Const. amend. V; *see also* Article 44(a), UCMJ ("No person may, without his consent, be tried a second time for the same offense."). It occurs when "charges for multiple violations *of the same statute* are predicated on arguably the same criminal conduct." *United States v. Forrester*, 76 M.J. 389, 395 (C.A.A.F. 2017) (emphasis in original) (citation and internal quotation marks omitted).

Based upon this principle, our superior court, this Court, and our sister courts have routinely agreed that "when Congress enacted Article 128, it did

---

[28] Record at 218.

[29] *Id.* at 218-19.

[30] Record at 223.

not intend that, in a single altercation between two people, each blow might be separately charged as an assault." *United States v. Morris*, 18 M.J. 450 (C.M.A. 1984). Instead, acts "united in time, circumstance, and impulse in regard to a single person" comprise but one assault. *See e.g., United States v. Rushing*, 11 M.J. 95, 98 (C.M.A. 1981) (accused striking at victim with his fist and then throwing a pool stick was but one assault); *Hernandez*, 78 M.J. at 647 (C.G. Ct. Crim. App. 2018) (three specifications of assault consummated by a battery consolidated to one when touchings were part of "continuous course of conduct"); *United States v. Clarke*, 74 M.J. 627 (A. Ct. Crim. App. 2015) (two assaults consolidated as stemming from touchings "united in time, circumstance, and impulse"); *United States v. Lopez*, No. 201300394, 2014 CCA LEXIS 441, at *9 (N-M Ct. Crim. App. Jul. 22, 2014) (unpub. op.) (specifications consolidated as multiplicious where separate touchings occurred "immediately" after each other); *United States v. Lombardi*, No. 200001461, 2002 CCA LEXIS 138, at *5 (N-M Ct. Crim. App. Jun. 26, 2002) (unpub. op.) ("we conclude that each unlawful touching of the same person in a single, uninterrupted altercation, united in time, circumstance, and impulse should not be the basis for multiple charges of assault"). We reiterate that holding here.

The military judge's determination that "all three acts were separated by five minutes" is not supported by the record. In fact, Appellant ultimately told the judge that the acts alleged in the first two specifications happened during a "ten minute" fight and spoke of no break during that time. Those acts were clearly "united in time, circumstance, and impulse" and should have been consolidated. The act alleged in Specification 3, which Appellant said followed a five minute cool down period, was separate and distinct from the previous two. *See United States v. Flynn*, 28 M.J. 218, 220-21 (C.M.A. 1989) (separate acts not multiplicious when even a short lapse of time involved). Therefore, we will consolidate only Specifications 1 and 2 of Charge III.

## C. Whether Appellant's Trial Defense Counsel Were Ineffective

In this assignment of error, Appellant claims that his trial defense counsel [TDC] were ineffective by: (1) failing to recognize the issues discussed above; (2) "misleading" Appellant regarding the law of self-defense; (3) failing to inform Appellant about how his conviction would impact his right to vote, and; (4) failing to introduce any evidence of the financial impact that a loss of retirement benefits would have on Appellant, and; (5) failing to object to Pros. Ex. 3, TS's unsworn "victim impact statement."

The Sixth Amendment to the United States Constitution entitles criminal defendants to representation that does not fall "below an objective standard of reasonableness" in light of "prevailing professional norms." *Strickland v.*

*Washington*, 466 U.S. 668, 688 (1984). We review de novo claims of ineffective assistance, *United States v. Harpole*, 77 M.J. 231, 236 (C.A.A.F. 2018), and Appellant must demonstrate both "(1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice." *United States v. Green*, 68 M.J. 360, 361 (C.A.A.F. 2010) (citing *Strickland*, 466 U.S. at 687). The two prongs of this test can be analyzed independently and if Appellant fails either prong, his claim fails. *Strickland*, 466 U.S. at 697. "An appellant must establish a factual foundation for a claim of ineffectiveness; second-guessing, sweeping generalizations, and hindsight will not suffice." *United States v. Davis*, 60 M.J. 469, 473 (C.A.A.F. 2005).

"In the guilty plea context, the first part of the *Strickland* test remains the same—whether counsel's performance fell below a standard of objective reasonableness expected of all attorneys." *United States v. Bradley*, 71 M.J. 13, 16 (C.A.A.F. 2012) (citing *Hill v. Lockhart*, 474 U.S. 52, 56-58 (1985)). We must also "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Having considered and found meritless Appellant's contentions regarding legal impossibility, liability as a principal under Article 77, UCMJ, and the language of Article 120c(a)(3), UCMJ, we find none of those alleged errors resulted in ineffective assistance. We turn now to the remainder of his claims.

In a post-trial affidavit, Appellant makes sweeping assertions that his counsel lied, misinformed, and "pressured" him into pleading guilty. His counsels' response affidavits are consistent with each other and refute each of these allegations, creating a dispute between the parties. Therefore, as a threshold matter, we have considered whether a post-trial evidentiary hearing is required to resolve any factual disputes and are convinced such a hearing is unnecessary. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997).

*1. Appellant asserts his trial defense counsel misled him on the law of self-defense*

Appellant states that he acted in self-defense when TS instigated the physical altercation, but his counsel informed him that self-defense would "not apply" because he "was the man." Specifically:

> They told me to say things I did not agree with, such as the incident with my wife. She instigated the incident and hit me first. Then she grabbed my cheek in a "fishhook" way and started squeezing and twisting, so I grabbed her arm to push her off, but that was causing me more pain because she still had me in the fishhook. That is when I grabbed her by her neck to push her away. That was successful in getting her to let go,

but then she punched me. I was trying to protect myself. There was not a "cooling off" period, it was just one continuous fight. When the military judge asked me about self-defense and told me to discuss self-defense with [TDC], [TDC] told me to tell the military judge self-defense did not apply. [TDC] told me it would not matter that [TS] instigated the fight because I was the man, which I felt was discriminatory based on gender. He said words to the effect if I tried to claim self-defense, everything would be ruined, the guilty plea would be canceled, they would retract the pretrial agreement, I would get convicted at a contested court-martial[.][31]

In his response to Appellant's claim, lead defense counsel stated:

We engaged in numerous conversations with [Appellant] about this topic over the course of several months and explained to him possible justifications for battering his wife. Based on [his] explanation of events to us, none of these justifications applied to his case. He admitted to us that he did not need to use force to protect himself from Ms. T.S. and that he had various ways of deescalating the argument with her short of physically striking her. At no time did I advise [him] that, as a man, he could not claim self-defense against his wife. I do remember discussing with him the reality that members would likely find his self-defense argument implausible given the size disparities between him and Ms. T.S. This was not a blanket rejection of self-defense as a justification for force—it was an assessment of the likelihood that he would be convicted at a contested court-martial.[32]

While we might generally order a factual hearing when Appellant's and his trial defense counsel's affidavits conflict, we need not do so here, where the record clearly indicates Appellant understood that self-defense was applicable to his altercation with TS. In addition to routinely telling the military judge that he had no legal excuse for causing bodily harm to TS during the *Care*[33] inquiry, the military judge specifically told Appellant that self-defense was available:

---

[31] Appellant's Affidavit of Nov. 15, 2018 at 2-3.

[32] Trial Defense Counsel's Affidavit of Feb. 18, 2020 at 2.

[33] *United States v. Care*, 40 C.M.R. 247 (C.M.A. 1969).

MJ: [S]elf-defense is a potential defense to assault and battery . . . it would apply if you had a reasonable belief that harm was about to be inflicted on you—bodily harm—and you must have actually believed that the force you used was necessary to prevent bodily harm . . . [DC], have you had an opportunity to discuss the issue of self-defense?

DC: We have, sir. Thank you . . .

MJ: All right. Do you believe that self-defense is a possible defense in this matter?

DC: No, sir.

MJ: Okay. Gunny, have you had an opportunity to talk with [TDC] about that?

ACC: Yes, sir.

MJ: Do you believe that self-defense may be a defense in this case?

ACC: No, sir.

MJ: At any point during any of the assaults—the three specifications we talked about before, at any point, did you believe that the force you used was necessary to prevent bodily harm?

ACC: No, sir.[34]

After being clearly informed by the military judge that self-defense could apply to his altercation with TS, we find Appellant's claim that he believed otherwise improbable. *See Ginn*, 47 M.J. at 248 (stating "if the affidavit is factually adequate on its face but the appellate filings and the record as a whole 'compellingly demonstrate' the improbability of those facts, the Court may discount those factual assertions and decide the legal issue"). Instead, when the military judge asked him if self-defense applied to him, Appellant either told the truth or falsely told the judge that it did not in order to preserve the benefit of his pretrial agreement. Either way, Appellant has failed to establish his counsel were ineffective on this issue.

---

[34] Record at 320-321.

*2. Appellant asserts his trial defense counsel failed to explain collateral consequences to him*

Next, Appellant complains that his conviction will result in the loss of his right to vote in his home state during the period of suspended confinement. Further, Appellant claims "[my TDC] never informed me that that I would not be eligible to vote while I was in confinement. I only recently found out . . . that I cannot vote during the period of suspended confinement. I want to vote . . . had I known these things, I would not have plead guilty."[35] Appellant's trial defense counsel disputes this claim, responding:

> I do not specifically recall instructing [Appellant] on how his guilty plea or the pretrial agreement might impact his right to vote. This was standard advice that I routinely provided to all of my clients facing court-martial conviction, however, so I am confident that I covered the topic with him during our initial meetings and prior to recommending his acceptance of the pretrial agreement. At no time did [Appellant] express concern about losing his right to vote . . . Appellant did not make his guilty plea contingent on being able to vote, nor did we mislead him on whether he would be able to vote. It was a non-issue for him throughout the entire process.[36]

Even were we to accept Appellant's version of events, he would not be entitled to relief. While the first prong of *Strickland* remains the same for guilty pleas, "[t]he second prong is modified to focus on whether the 'ineffective performance affected the outcome of the plea process.'" *Bradley*, 71 M.J. at 16 (quoting *Hill*, 474 U.S. at 59). "[T]o satisfy [this] requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* (quoting *Hill*, 474 U.S. at 59). Appellant fails to establish such a probability.

Even though he claims he would not have pleaded guilty were it not for his counsels' alleged misinformation, dishonesty and coercion, mere allegations post-trial are insufficient. *See Bradley*, 71 M.J. at 17 (affidavit alleging that the appellant would not have pleaded guilty if the defense counsel had made the appellant aware that the plea waived a disqualification issue is insufficient to demonstrate prejudice.) Instead, Appellant must satisfy a

---

[35] Appellant's Affidavit of Nov. 15, 2018 at 2.

[36] Trial Defense Counsel's Affidavit of Feb. 18, 2020 at 2.

separate, objective inquiry and "must show that if he had been advised properly, then it would have been rational for him not to plead guilty." *Id.* Considering the strength of the Government's case and that charges of conspiring to rape EF by administering a drug as well as communicating a threat to "burn [TS's] house down with her kids in it," were dismissed as part of the pretrial agreement, Appellant has failed to persuade us that contesting those charges in the hopes of preventing the temporary suspension of his voting rights would have been a rational choice.

*3. Appellant asserts his trial defense counsel failed to introduce evidence of financial impact from loss of retirement*

Appellant's next claim is that, since he had over eighteen years of active duty at the time of his sentencing hearing, his trial defense counsel's failure to present loss of retirement benefits to the military judge constitutes ineffective assistance:

> With the agreement to 'voluntarily' extend[ ] my active duty service, I think I would have been retirement eligible, either for length of service or disability. They did not discuss the process my unit would have to go through to separate me with an Other Than Honorable Discharge, if they chose to separate me for misconduct. I found out that at worst, if I was separated for expiration of active service, I would have received a General Under Honorable Conditions discharge. I was not advised that an administrative separation for misconduct would have been pursued. They did not investigate whether I was eligible for an early retirement, and if so, what I would lose in retirement benefits if a punitive discharge was adjudged.[37]

Appellant's trial defense counsel responds that Appellant would not have been able to retire and that his trial defense counsel's choice was a tactical one:

> [Appellant] was not eligible for retirement at the time of his guilty plea, and, because of his misconduct, he would not have fallen within the "sanctuary" from administrative separation normally offered to servicemembers between eighteen and twenty years of service. Also, in the pretrial agreement, [Appellant] agreed to waive his right to an administrative separation board were he to not receive a punitive discharge at the court-

---

[37] Appellant's Affidavit of Nov. 15, 2018 at 2.

martial. Finally, [Appellant] had already reached his end of active service in November 2017, months before his guilty plea. His command had placed him on legal hold, and the only reason he remained in the Marine Corps was to face court-martial. To retire from active-duty, [Appellant] must have successfully reenlisted with a general court-martial conviction for sex crimes and violent offenses. This was highly improbable. As a result, [the assistant trial defense counsel] and I decided to focus our presentencing arguments on [Appellant's] good military character and performance as a Marine rather than on a retirement benefit he would be unlikely to receive anyway. We still presented the financial impact argument to the military judge, who was familiar with the fallout from a punitive discharge, but we did not want to detract from our primary arguments by introducing evidence so far attenuated from what [Appellant] was likely to receive.[38]

Even assuming that counsels' performance was deficient, we are persuaded that Appellant suffered no prejudice. Documents entered by Appellant at sentencing indicate that Appellant entered active duty prior to 10 September 1999, informing the judge that Appellant had over eighteen years of active service at the time of sentencing.[39] Moreover, Appellant's pretrial agreement, which the judge covered with Appellant on the record, specifically included the following provision: "Loss of Retirement Benefits Notification. My defense attorney has advised me that any punitive discharge/dismissal that is adjudged and ultimately approved in my case may adversely affect my ability to receive retirement pay and any and all other benefits accrued as a result of my military service."[40] That a Marine is eligible for retirement benefits after a set number of years of active service is a fact commonly known to trial judges, who routinely instruct member's panels on such issues. We are therefore confident that this judge was well aware of any retirement-related consequences to Appellant of a punitive discharge and that Appellant suffered no prejudice as a result of any failure to present additional information to the trial court on that matter.

---

[38] Trial Defense Counsel's Affidavit of Feb. 18, 2020.

[39] *See* Def. Ex. A at 8.

[40] AE XXI at 7.

*4. Appellant asserts his trial defense counsel failed to object to Prosecution Exhibit 3, TS's unsworn "victim impact statement"*

Appellant also claims that the military judge erred in admitting Pros. Ex. 3, an unsworn written statement signed by TS and titled "Victim Impact Statement" wherein TS described the impact of Appellant's physical abuse on her and her children, including the financial and legal impacts she continued to endure. The Government did not articulate under which rule it was offering the evidence, simply asking the military judge to admit "prosecution exhibit 3."[41] When asked if he had any objection to the exhibit, TDC replied "No, Your Honor."[42]

Appellant asserts Pros. Ex. 3 was erroneously admitted, as R.C.M. 1001A, requires that a "victim impact statement" be a "court" exhibit and not a "prosecution" exhibit. Further, Appellant claims TS's statement "contained objectionable matters that did not relate to or result from [Appellant's] convictions for assaulting her" but instead referred to "uncharged misconduct" and "withdrawn charges."[43] The Government responds that Appellant waived the issue when his trial defense counsel responded that he had no objection to the document. Finally, in his reply brief, Appellant alleges that his trial defense counsel's failure to object to Pros. Ex. 3 constitutes ineffective assistance of counsel, and therefore "application of the waiver doctrine is inappropriate."[44]

Regardless of the asserted error, Appellant was not prejudiced by the manner in which Pros Ex. 3 was admitted. A victim may use an unsworn statement that may be oral, written, or both, and the victim may not be cross-examined by trial counsel or defense counsel upon it or examined upon it by the court-martial. R.C.M. 1001A(e). However, in addition to labeling the exhibit as a prosecution exhibit, Pros. Ex. 3 lacks any other indicia that it was offered by the victim in exercise of her right to be reasonably heard in accordance with R.C.M. 1001A.

On the other hand, the Government, in its own right, may offer aggravation evidence in accordance with R.C.M. 1001(b)(4): "Evidence in aggravation includes, but is not limited to, evidence of financial, social, psychological, and medical impact on or cost to . . . the victim of an offense committed by the

---

[41] Record at 238.

[42] Record at 243.

[43] Appellant's Brief at 31.

[44] Appellant's Reply at 19.

accused . . . ." We also note that R.C.M. 1001A defines "victim impact" with nearly identical words.[45] One significant distinction between statements *offered by a victim* in exercising her right to be reasonably heard and victim impact evidence *offered by the Government*, the latter may not, over Defense objection, be admitted in the form of an unsworn written statement. In practice, however, the Government frequently offers aggravation evidence that would be otherwise objectionable under the rules of evidence—due to it being hearsay or lacking formal authentication—and such objections are routinely waived by the Defense in guilty plea cases such as this for legitimate tactical reasons. *Cf.* R.C.M. 1001(c)(3) (military judge may relax rules of evidence for extenuation and mitigation evidence); R.C.M. 1001(d) (if rules of evidence relaxed under 1001(c)(3), they may relaxed to the same degree for prosecution rebuttal evidence).

Assuming there was any error in admitting Pros. Ex. 3 with the consent of the Defense, we find no prejudice in this guilty plea case. Trial was by military judge alone, who was already aware of the "uncharged misconduct" and "withdrawn charges" to which Appellant complains TS referred. To the extent this information was inadmissible, we presume the military judge knew the law and applied it correctly. *United States v. Sanders,* 67 M.J. 344, 346 (C.A.A.F. 2009).

For those reasons, we disagree with Appellant's assertion that his conviction must be set aside for ineffective assistance of counsel.

## D. Whether the Record of Trial is Incomplete Because Pages Are Missing and It Was Incorrectly Authenticated

On 27 February 2018, the parties argued several motions at a pretrial hearing. The individual authenticating this portion of the record was the "Chief Court Reporter" who was not present at this hearing. Immediately above his signature, this note was included: "Per R.C.M. 1104(a)(2)(B), the court reporter shall authenticate the record of trial when this duty would fall upon a member under this subsection. The military judge has conducted a permanent change of duty."[46] Under the Chief Court Reporter Chief's signature was this handwritten note: "**\*** [The Court Reporter] is no longer

---

[45] R.C.M. 1001A(b)(2): "For purposes of this rule, 'victim impact' includes any financial, social psychological, or medical impact on the victim directly relating to or arising from the offense of which the accused has been found guilty."

[46] Authentication of the Record of Trial of Jul. 11, 2018.

available; he is currently attending Officer Candidate School."[47] Appellant now argues that, since the Chief Court Reporter was not present at the portion of the record that he authenticated, the record is "incomplete." The Government responds that, even if the record was not properly authenticated, Appellant has not shown prejudice. Both parties are correct.

Whether a record of trial is complete is a question of law we review de novo. *United States v. Henry*, 53 M.J. 108, 110 (C.A.A.F. 2000). R.C.M. 1103 required the Government to prepare a verbatim transcript of all sessions of Appellant's trial. R.C.M. 1104(a)(1) required that such record be authenticated to "declare that the record accurately reports the proceedings." R.C.M. 1104(a)(2) establishes the method of authentication, requiring that if neither the military judge nor the trial counsel are able to authenticate the record, the court reporter present at the relevant proceedings may do so.

The Government concedes that the Chief Court Reporter was not present at that portion of trial corresponding to the record that he authenticated. Thus, that portion of the record was not properly authenticated. However, absent a specific finding of prejudice to Appellant or an inability for this Court to conduct meaningful review of Appellant's case under Article 59(a), UCMJ, that procedural error is harmless. *United States v. Merz*, 50 M.J. 850, 854 (N-M. Ct. Crim. App. 1999).

Appellant does not now claim that the portion of the record was inaccurate or that he otherwise suffered any prejudice by this error and we identify none. The proceedings at issue consisted of a single day wherein the parties litigated several motions. All of these motions, the opposing party's responses, and the judge's rulings (with the exception of a ruling granting a Defense request to prohibit the Government from using the term "victim" at trial), were reduced to writing and included in the record as appellate exhibits. Moreover, with the exception of a Defense motion to dismiss for "spoliation," none of the motions included any additional evidence offered at the proceedings. Finally, Appellee has submitted the original trial counsel's statement wherein he purports to authenticate this portion of the proceedings. While such a post-hoc submission does not cure the error, it is a relevant factor in determining whether such error was harmless. *See* R.C.M. 1104(d) (setting forth procedures for correcting an incomplete or defective record of trial). For

---

[47] *Id.*

the foregoing reasons, we are able to conduct an adequate review under Article 59(a), UCMJ, and Appellant was not prejudiced by this error.[48]

## III. CONCLUSION

### A. Consolidating Charge III, Specifications 1 and 2

The supplemental court-martial order shall reflect that Specifications 1 and 2 of Charge III are consolidated into a single specification to read:

> Specification 1: On or about 2 September 2017 at or near Fredericksburg, Virginia, active duty U.S. Marine GySgt Gregory Simpson unlawfully grabbed [TS] by the arms with his hands and threw her around a room and grabbed [TS] by the neck with his hands and pinned her against a wall.

Specification 3 of Charge III shall be renumbered to read "Specification 2."

### B. Sentence Reassessment

Having consolidated Specifications 1 and 2 of Charge III into a single specification, we must determine if we are able to reassess Appellant's sentence. We have "broad discretion" when reassessing sentences. *United States v. Winckelmann*, 73 M.J. 11, 12 (C.A.A.F. 2013). However, we can only reassess a sentence if we are confident "that, absent any error, the sentence adjudged would have been of at least a certain severity . . . ." *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986). A reassessed sentence must not only "be purged of prejudicial error [but] also must be 'appropriate' for the offense[s] involved." *Id.*

In determining whether to reassess a sentence or to order a sentencing rehearing, we consider the factors espoused in our superior court's holding in *Winckelmann*: (1) whether there has been a dramatic change in the penalty landscape and exposure; (2) the forum of the court-martial; (3) whether the remaining offenses capture the gravamen of the criminal conduct and whether significant or aggravating circumstances remain admissible and relevant; and (4) whether the remaining offenses are the type with which we as appellate judges have experience and familiarity to reasonably determine what sentence would have been imposed at trial. *Winckelmann*, 73 M.J. at 15-16.

---

[48] Appellant also avers there are pages missing from his copy of the record of trial. These pages are not missing from the original record of trial.

Under the circumstances of this case, we find that we can reassess the sentence and it is appropriate for us to do so. Significantly here, the penalty landscape remains unchanged because the military judge had already merged for sentencing all three specifications of Charge III. The remaining convictions capture the gravamen of the criminal conduct because our decision to consolidate the two batteries sets aside no criminal conduct.

Considering the totality of circumstances presented by Appellant's case, we can confidently and reliably determine that, absent the error, Appellant's sentence would still include at least reduction to E-1, confinement for thirty-two months, and a bad conduct discharge. We find this sentence to be an appropriate punishment for the remaining convictions and this offender—thus satisfying the requirement for a reassessed sentence both purged of error and appropriate. *Sales*, 22 M.J. at 308.

After careful consideration of the record, each of the submitted assignments of error, the briefs of appellate counsel, post-trial affidavits, and oral argument, the remaining findings of guilty and only so much of the sentence as provides for confinement for thirty-two months (with all confinement in excess of eighteen months suspended for a period of forty-four months from the date of sentence), reduction to pay grade E-1, and a bad conduct discharge are **AFFIRMED**.

Judge STEPHENS and Judge ATTANASIO concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court